MILLER, Internal Revenue Collector, et al. v. SNAKE RIVER
VALLEY R. CO.

(Circuit Court of Appeals, Ninth Circuit. May 26, 1915.)

No. 2588.

INTERNAL REVENUE ☞9—EXCISE TAX ON CORPORATIONS—CORPORATION "ENGAGED IN BUSINESS."

During the greater part of the year 1910 plaintiff, a railroad company, owned a line of railroad which, with its rolling stock and equipment, was leased and operated by the lessee, which was obligated by the lease to pay all expenses of maintenance and renewal, taxes on the property, and other incidental expenses, but was entitled to retain from the rental the cost of certain permanent improvements made. During such time the lessor maintained its offices, transferred stock, collected and deposited the rental, and expended such sums as were necessary in maintaining its corporate existence, including the state corporation tax. Before the end of the year the lease was canceled by mutual consent, and the lessor immediately sold and transferred all of the property, and from the proceeds paid its bonded and other indebtedness. Held, that the lessor was not "engaged in business" during the year, within the meaning of Corporation Tax Act Aug. 5, 1909, c. 6, § 38, 36 Stat. 112 (Comp. St. 1913, § 6300), and that it was not subject to the excise tax imposed thereby.

[Ed. Note.—For other cases, see Internal Revenue, Cent. Dig. §§ 13–28; Dec. Dig. ☞9.

For other definitions, see Words and Phrases, First and Second Series, Engage.]

In Error to the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Action at law by the Snake River Valley Railroad Company against M. A. Miller, Collector of Internal Revenue for the District of Oregon, and David M. Dunne, ex-Collector. Judgment for plaintiff, and defendants bring error. Affirmed.

Clarence L. Reames, U. S. Atty., and E. A. Johnson, Asst. U. S. Atty., both of Portland, Or., for plaintiffs in error.

W. W. Cotton, Arthur C. Spencer, and W. A. Robbins, all of Portland, Or., for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and RUDKIN, District Judge.

RUDKIN, District Judge. At the times hereinafter mentioned the Snake River Valley Railroad Company, a corporation organized and existing under the laws of the state of Oregon, was the owner of a line of railroad extending from the town of Wallula to the town of Grange City in the state of Washington. On the 29th day of June, 1907, the company leased this line of railroad, together with all equipment and appurtenances of every kind and nature whatsoever to the same belonging or appertaining, to the Oregon Railroad & Navigation Company for the term of five years from and after the 1st day of July, 1907. Under the terms of this lease the lessee agreed to operate the railroad, and to pay all expenses of operation, maintenance, repairs, and renewals, and all incidental expenses connected therewith, including taxes and assessments levied against the demised premises. The lessor agreed to repay to the lessee, with interest at the rate of 6 per cent. per annum, all sums advanced by the lessee upon the request of the lessor or necessarily expended by the lessee for additions and betterments to the demised premises, or for the purchase of locomotives, cars, and other equipment for use upon the railroad or in connection therewith, and the lessee was authorized to retain out of the rentals payable to the lessor any sums owing from the lessor for these purposes, together with interest. The annual rental of $140,000, less deductions for improvements and interest, was payable in semiannual installments of $70,000 each on the 1st day of June and the 1st day of December of each year during the term. The lease provided for a forfeiture in case of default on the part of the lessee, and also for its termination upon 60 days' notice in writing by either party to the other. The lease was terminated by mutual consent on the 23d day of December, 1910, and the demised premises were thereupon immediately conveyed to the Oregon-Washington Railroad & Navigation Company.

The present action was instituted by the Snake River Company against the collector and ex-collector of internal revenue for the district of Oregon to recover the sum of $870.70, corporate income tax paid by the Snake River Company to the collector under protest, under the provisions of section 38 of the act of August 5, 1909, commonly known as the Corporate Income Tax Act. The sole question presented by the record is: Was the Snake River Company "engaged in business" during the taxing year 1910 within the meaning of that act? The question thus raised depends upon the sufficiency of the

answer interposed by the defendants, to which a demurrer was sustained by the court below, and judgment given on the pleadings. A writ of error was sued out by the defendants to review this judgment. The defense interposed by the answer is well summarized in the brief of the plaintiffs in error as follows:

"It is alleged in the answer in this case, and by the demurrer admitted, that during the greater portion of the tax year mentioned defendant in error was the owner of the line of railroad in its complaint described, with rolling stock and equipment necessary to the operation thereof; that during the year in question this company maintained general offices in the city of Portland, Or., and during that time maintained its corporate existence by the holding of stockholders' meetings, and the election thereat and appointment thereafter to its various offices of corporate directors and officers, who on behalf of the corporation were engaged in collecting the income and rents accruing by virtue of the lease of its property and otherwise, in the making of transfers of stock of the corporation, and in the management of the finances and invested funds thereof, and that during the taxing year mentioned, in addition to the usual and routine business of the Snake River Company, and through the agency of its lessee, and in accordance with the terms of its lease, it engaged in the construction of certain new warehouse railroad tracks, and of other railroad tracks connecting the line of railroad of the Snake River Railroad Company with the line and road of the North Coast Railroad Company; that it also constructed in the manner aforesaid a stock and cattle passageway thereunder or thereover; that before the expiration of the taxing year it was determined by the stockholders and officers and directors of the Snake River Company that the lease theretofore made of its property should be canceled, and the property sold; that during the taxing year in question this lease was canceled (the lease itself providing for cancellation by either party thereto upon 30 days' notice to the other, but in this case cancellation being reached in less time by written agreement); that immediately after the cancellation of the lease, and on the date of December 23, 1910, and during the tax year, the entire railroad, plant, and equipment of defendant in error was sold; that on the same day the proceeds of such sale, in the amount of over $2,000,000, were received by the Snake River Company; that prior to the closing of the taxing year the Snake River Company, out of the proceeds of such sale of its property, paid its total bonded indebtedness in the amount of $1,500,000, and retired the bonds representing the same; that prior to the close of the taxing year, and out of the proceeds of the sale of its said property, the defendant in error company repaid to other railroad companies considerable sums of money theretofore advanced to defendant in error by these other companies on account of construction work by defendant in error undertaken; and that, with other business done and transacted by defendant in error company during the taxing year in question, was the payment of state annual corporate license taxes, the maintenance of offices, the carrying of accounts in bank, and depositing therein and withdrawing therefrom from time to time of sums of money, and generally all such acts are usual and necessarily incident to such transaction of the business as is pleaded in this answer."

Section 38 of the Corporation Tax Law (36 Stat. 112 to 117), provides:

"That every corporation, * * * organized for profit and having a capital stock represented by shares, * * * and engaged in business in any state, * * * shall be subject to pay annually a special excise tax with respect to the carrying on or doing business by such corporation, * * * equivalent to one per centum upon the entire net income over and above five thousand dollars received by it from all sources during such year, exclusive of amounts received by it as dividends upon stock of other corporations, * * * subject to the tax hereby imposed."

This statute has been considered by the Supreme Court in the following cases: Flint v. Stone Tracy Company, 220 U. S. 107, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312; Zonne v Minneapolis Syndicate, 220 U. S. 187, 31 Sup. Ct. 361, 55 L. Ed. 428; McCoach v. Minehill Railway Co., 228 U. S. 295, 33 Sup. Ct. 419, 57 L. Ed. 842. In speaking of its former decisions, in McCoach v. Minehill Railway Company, the court said:

"In applying this principle to the several cases then sub judice—in some of which the validity of the tax was challenged by the stockholders of certain real estate companies whose business was principally the holding and management of real estate—the court dealt, among others (Flint v. Stone Tracy Co., 220 U. S. 170, 31 Sup. Ct. 342, 55 L. Ed. 389, Ann. Cas. 1912B, 1312), with the Park Realty Company, organized to 'work, develop, sell, convey, mortgage or otherwise dispose of real estate; to lease, exchange, hire or otherwise acquire property; to erect, alter or improve buildings; to conduct, operate, manage or lease hotels, apartment houses, etc.; to make and carry out contracts in the manner specified concerning buildings * * * and generally to deal in, sell, lease, exchange or otherwise deal with lands, buildings and other property, real or personal,' etc. At the time the bill was filed in that case the business of the Park Realty Company related only to the management and leasing of one hotel. Others of the realty companies that were before the court were engaged in more extensive business transactions. The court held (page 171 of 220 U. S., page 357 of 31 Sup. Ct. [55 L. Ed. 389, Ann. Cas. 1912B, 1312]): 'We think it is clear that corporations organized for the purpose of doing business, and actually engaged in such activities as leasing property, collecting rents, managing office buildings, making investments of profits, or leasing ore lands and collecting royalties, managing wharves, dividing profits, and in some cases investing the surplus, are engaged in business within the meaning of this statute, and in the capacity necessary to make such organizations subject to the law.'

"Another case argued and decided at the same time, but separately reported, is Zonne v. Minneapolis Syndicate, 220 U. S. 187, 31 Sup. Ct. 361, 55 L. Ed. 428. In this case the court held that the corporation was not doing business in such wise as to make it subject to the tax imposed by the act of 1909, because while originally organized for and engaged in the business of letting stores and offices in a building owned by it, and collecting and receiving rents therefor, it had afterwards made a lease of all lands belonging to it to certain trustees for a term of 130 years, and then had caused its articles of incorporation, which had been those of a corporation organized for profit, to be so amended as to confine the purpose of the corporation to the ownership of the lands in question, subject to the lease, and 'for the convenience of its stockholders to receive, and to distribute among them, from time to time, the rentals that accrue, under said lease, and the proceeds of any disposition of said land.' The court said (page 190 of 220 U. S., page 362 of 31 Sup. Ct. [55 L. Ed. 389, Ann. Cas. 1912B, 1312]): 'The corporation involved in the present case, as originally organized and owning and renting an office building, was doing business within the meaning of the statute as we have construed it. Upon the record now presented we are of opinion that the Minneapolis Syndicate, after the demise of the property and reorganization of the corporation, was not engaged in doing business within the meaning of the act. It had wholly parted with control and management of the property; its sole authority was to hold the title subject to the lease for 130 years, to receive and distribute the rentals which might accrue under the terms of the lease, or the proceeds of any sale of the land if it should be sold. The corporation had practically gone out of business in connection with the property and had disqualified itself by the terms of reorganization from any activity in respect to it.'"

In McCoach v. Minehill Railway Company:

"The Minehill Company was incorporated by an act of the Legislature of the state of Pennsylvania, approved March 24, 1828 (P. L. p. 205), for the

purpose of constructing and operating a railroad, with appropriate powers, including the power of eminent domain. Under this charter a railroad was built and for many years operated. Under the authority of general acts of the Legislature, approved respectively April 23, 1861 (P. L. p. 410), and February 17, 1870 (P. L. p. 31), the Minehill Company, in the year.1896, leased its entire railroad, with all side tracks, extensions, and appurtenances of every kind, and all rolling stock and personal property of every description in use or adapted for use in, upon, or about the railroad (excepting some property intended to have been described in a schedule annexed to the lease, but which is not described, no such schedule having been annexed), and also 'all the rights, powers, franchises (other than the franchise of being a corporation), and privileges which may now, or at any time hereafter during the time hereby demised, be lawfully exercised or enjoyed in or about the use, management, maintenance, renewal, extension, alteration, or improvement of the demised premises, or any of them,' unto the Philadelphia & Reading Railway Company for a term of 999 years from January 1, 1897, at a yearly rental of $252,612, that being equivalent to 6 per centum upon the. capital stock of the Minehill Company. The lessee agreed to keep the road in good order and repair, keep it in public use and efficiently operate it, and return it to the lessor company at the expiration or other determination of the lease. The Minehill Company agreed during the term of the lease to maintain its corporate existence and organization, and that when requested by the lessee it would 'put in force and exercise each and every corporate power, and do each and every corporate act which the Minehill Company might now, or at any time hereafter, lawfully put in force or exercise, to enable the railway company (the lessee) to enjoy, avail itself of, and exercise every right, franchise, and privilege in respect of the use, management, maintenance, renewal, extension, etc., of the property demised, and of the business to be there carried on.' It was provided that upon default in the payment of the rent reserved, or in the performance of certain other covenants, the lessor might declare the lease forfeited and re-enter and repossess the demised premises. The lease further provided that the lessee might, under certain circumstances, abandon certain railway lines, 'whenever it shall be found legally practicable to abandon so much of the said lines of railroad, without working a forfeiture or any impairment of the chartered rights and franchises of the Minehill Company as to its railroads, or any part thereof, or without creating any liability on the part of the Minehill Company or the Railway Company, to the public or the commonwealth, for the nonuser of such portions of the railroad lines.' In the event thus provided for the abandoned rails, machinery, etc., are to be sold and the proceeds turned over to the Minehill Company, and the annual rental proportionately reduced. Pursuant to this lease the entire railroad and all property connected therewith was turned over to the Reading Company, and since then has been operated by that company, and the Minehill Company has not carried on any business in connection with the operation of it. It has, however, maintained its corporate existence and organization by the annual election of a president and board of managers, and this board has annually elected a secretary and treasurer. It receives annually from the Reading Company the fixed rental called for by the lease, and it receives annually sums of money as interest on its bank deposits, and also maintains a 'contingent fund,' from which it receives annual sums as interest or dividends. And it annually pays the ordinary and necessary expenses of maintaining its office and keeping up the activities of its corporate existence, including the payment of salaries to its officers and clerks. It keeps and maintains at its offices stockbooks for the transfer of its capital stock, and this stock is bought and sold upon the market. The annual income from the contingent fund appears to be about $24,000, its annual payments for state taxes about as much, and its expenditures for corporate maintenance about $5,000."

Under the foregoing facts it was held that the lessor company was not subject to the payment of the tax provided for in the corporation tax law. We have quoted at length from this case because of its close analogy to the case at bar. That decision is decisive here, in so

far as the mere ownership of the property, the maintenance of offices, the keeping up of its corporate existence, the transfers of stock, the collection of rents, and looking after investments by the lessor company is concerned.

We will now consider briefly the points of difference between the two cases from the standpoint of the government. Our attention is first directed to the difference in the duration of the terms of the two leases; the lease in the Minehill Case running for 999 years, and the lease in the present case running for 5 years only. This distinction no doubt exists, but it is a distinction without a difference. If the lessor of a railroad is not engaged in business or operating the railroad under a lease for 999 years, for the very same reason it is not engaged in business or operating the railroad under a lease for 5 years; for, whether the lease be for a long term or a short term, the relations of the lessor and lessee to the demised premises are exactly the same. It is further suggested that the lease in the Minehill Case was authorized by the Legislature of the state of Pennsylvania. So here the lease was authorized, or rather ratified, by the laws of the state of Washington, unless the two corporations involved are competing lines, and there is no suggestion in the record that such is the case. Laws of 1909, p. 698, §§ 1 and 2; Rem. & Bal. Code, §§ 8665 and 8666. It further appears that certain improvements were made by the lessee under the terms of the lease, such as constructing an overhead or underground crossing and making certain track connections. This work was done by the lessee and inured to the benefit of the lessor, as do all permanent improvements on demised property, and the mere fact that the lessor paid for the improvements in the adjustment of the rent does not, in our opinion, constitute engaging in business. The only other distinction pointed out between the two cases is the sale of the property by the lessor and the payment of its indebtedness during the taxing year. Had the lessor been organized for the purpose of buying, selling, and leasing railroads, this sale would no doubt constitute engaging in business within the meaning of the law. But we do not understand that it was organized for any such purpose, and the mere sale of its property as an incident of ownership does not bring it within the statute. One reason for holding that the lessor was exempt from the tax in the Minehill Case was that the lessee company was doing the business as a railroad company upon the lines covered by the lease, and was taxable because of it, and the Corporation Tax Law does not contemplate double taxation in respect to the same business. So in this case the business of operating the railroad during the entire taxing year 1910 was conducted by the lessee or grantee. They were taxable because of that business, and to impose a like tax on the lessor would be double taxation, which the law does not contemplate.

We agree with the court below, therefore, that this case cannot be distinguished from McCoach v. Minehill Railway Company, and the judgment is accordingly affirmed.